

IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA

MILLENNIUM PHARMACY
SYSTEMS, INC.,

        Plaintiff,

    v.

HAMILTON PARK HEALTH CARE
CENTER, LTD., THE ATRIUM AT HAMILTON
PARK, HAMILTON PARK OPCO, LLC,
HAMILTON PARK ATRIUM OPCO
AND ALARIS HEALTH, LLC,

        Defendants.

CIVIL DIVISION

NO. _AD 13-11045_

**COMPLAINT IN CIVIL ACTION**

Filed on behalf of Plaintiff,
Millennium Pharmacy Systems,
Inc.

Counsel of Record for this Party:

John R. Gotaskie, Jr., Esquire
PA ID No. 81143

Rebecca L. Hagan, Esquire
PA ID No. 216418

FOX ROTHSCHILD LLP
625 Liberty Avenue, 29th Floor
Pittsburgh, PA  15222
Telephone: (412) 391-1334

IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA

| | |
|---|---|
| MILLENNIUM PHARMACY SYSTEMS, INC., | CIVIL DIVISION |
| Plaintiff, | NO. |
| v. | |
| HAMILTON PARK HEALTH CARE CENTER, LTD., THE ATRIUM AT HAMILTON PARK, HAMILTON PARK OPCO, LLC, HAMILTON PARK ATRIUM OPCO AND ALARIS HEALTH, LLC, | |
| Defendants. | |

## NOTICE TO DEFEND

YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claims set forth in the following pages, you must take action within TWENTY (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSON AT A REDUCED OR NO FEE.

| OFFICE OF THE PROTHONOTARY, BUTLER COUNTY 1st Floor Courthouse 124 West Diamond Street P.O. Box 1208 Butler, PA 16003 Telephone: (724) 284-5214 | BUTLER COUNTY BAR ASSOCIATION 201 North Main Street Butler, PA 16001 Telephone: (724) 841-0130 |
|---|---|

IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA

MILLENNIUM PHARMACY
SYSTEMS, INC.,

        Plaintiff,

   v.

HAMILTON PARK HEALTH CARE
CENTER, LTD., THE ATRIUM AT HAMILTON
PARK, HAMILTON PARK OPCO, LLC,
HAMILTON PARK ATRIUM OPCO
AND ALARIS HEALTH, LLC,

        Defendants.

CIVIL DIVISION

NO.

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, Millennium Pharmacy Systems, Inc., by its counsel,
Fox Rothschild LLP, and files this Complaint in Civil Action, stating as follows:

### PARTIES

1.     Plaintiff, Millennium Pharmacy Systems, Inc. ("Millennium"), is a
corporation organized and existing under the laws of the State of Delaware having its
registered office at 1515 West 22nd Street, Suite 910, Oak Brook, Illinois 60523 and
corporate headquarters located at Cranberry Business Park, Building 120, 100 East
Kensinger Drive, Suite 500, Cranberry Township, Pennsylvania 16066.

2.     Defendant, Hamilton Park Health Care Center, Ltd. ("Hamilton Park"), is a
corporation organized and existing under the laws of the State of New Jersey having a
registered office at 525 Monmouth Street, Jersey City, New Jersey 07302.

3.     Defendant, The Atrium at Hamilton Park ("Atrium"), is a corporation organized and existing under the laws of the State of New Jersey having a registered office at 330 9th Street, Jersey City, New Jersey 07302. Hamilton Park and Atrium shall be collectively referred to herein as the "Hamilton Park Defendants."

4.     Defendant, Hamilton Park OpCo, LLC d/b/a Alaris Health at Hamilton Park ("Alaris Hamilton Park"), is a corporation organized and existing under the laws of the State of New Jersey having a registered office at 1150 West Chestnut Street, P.O. Box 1553, Union, New Jersey 07083 and place of business located at 525 Monmouth Street, Jersey City, New Jersey 07302.

5.     Defendant, Hamilton Park Atrium OpCo, LLC d/b/a Alaris Health at the Atrium ("Alaris Atrium"), is a corporation organized and existing under the laws of the State of New Jersey having a registered office at 1150 West Chestnut Street, P.O. Box 1553, Union, New Jersey 07083 and place of business located at 330 9th Street, Jersey City, New Jersey 07302.

6.     Defendant, Alaris Health, LLC ("Alaris"), is a corporation organized and existing under the laws of the State of New Jersey having a registered office at 35 Journal Square Plaza, Suite 1103, Jersey City, New Jersey 07306.

7.     Upon information and belief, Alaris is the owner or parent corporation of Alaris Hamilton Park and Alaris Atrium. Alaris, Alaris Hamilton Park and Alaris Atrium shall be collectively referred to herein as the "Alaris Defendants."

8.     On July 15, 2010, Millennium and the Hamilton Park Defendants entered into a Pharmacy Services Agreement (the "Agreement"), a copy of which is attached hereto as Exhibit "A".

2

9.     The Agreement was subsequently amended pursuant to the terms of the Agreement by letters and agreements dated February 22, 2011, August 31, 2011 and January 1, 2012 (the "Amendments"). The provisions of the Amendments and their effective changes to the Agreement are not relevant to this Complaint.

## JURISDICTION AND VENUE

10.     Millennium does business and has its corporate headquarters located in Butler County, Pennsylvania.

11.     Section 15.6 of the Agreement provides that the Agreement "shall be construed and governed by the internal laws of Pennsylvania without application of its conflict of laws rules." Agreement, §15.6.

12.     Section 15.6 of the Agreement further provides that by entering the Agreement, the "parties submit to the exclusive jurisdiction of and venue in the state and federal courts located in Butler County, Pennsylvania with respect to any and all disputes concerning the subject of, or arising out of, this Agreement."

13.     Forum selection clauses are given effect unless unfair or unreasonable. See Patriot Comm. Leasing Co., Inc. v. Kremer Rest. Enters., LLC, 915 A.2d 647 (Pa. Super. 2006).

14.     As there is no federal court located in Butler County, jurisdiction and venue are proper in this court.

15.     Jurisdiction and venue are also appropriate in Butler County because it is the county where the cause of action arose and/or where a transaction or occurrence took place out of which the cause of action arose. Pa.R.Civ.P. 2179.

## FACTUAL BACKGROUND

16.    The Hamilton Park Defendants engaged in the operation of assisted living and nursing home facilities.

17.    Millennium provides full-service pharmacy solutions to, *inter alia*, assisted living and nursing home facilities.

18.    Pursuant to the terms of the Agreement, the Hamilton Park Defendants agreed to purchase pharmaceutical products and services from Millennium.

19.    The Effective Date of the Agreement was July 15, 2010 (the "Effective Date").

20.    Millennium began to provide services pursuant to the Agreement on July 15, 2010 (the "Services Commencement Date") to facilities located at 525 Monmouth Street, Jersey City, New Jersey 07302 and 330 9th Street, Jersey City, New Jersey 07302 (the "Facilities").

21.    Section 9.2 of the Agreement provides that the initial term of the Agreement shall be from the Effective Date to the second (2nd) anniversary of the Services Commencement Date (the "Initial Term").  Agreement, §9.2.

22.    Section 9.2 of the Agreement further provides that the Agreement will automatically extend for additional periods of one (1) year each upon the expiration of the Initial Term (a "Renewal Term") and each subsequent Renewal Term, unless either party notifies the other in writing no less than 90 days prior to the expiration of such Initial Term or Renewal Term of its election not to extend the Agreement, "time being of the essence."  Agreement, §9.2.

23.    The Initial Term ended July 15, 2012.  See Agreement, §9.2.

24.     Millennium received no notice in 2012 that the Hamilton Park Defendants elected not to extend the Agreement, thus the Agreement was automatically renewed for the period from July 15, 2012 to July 15, 2013.  Moreover, the Facilities continued to order and accept products and services from Millennium between July 15, 2012 and July 15, 2013.

25.     The Agreement is binding on and adheres to the parties and their successors.  Agreement, §15.4.

26.     Section 15.5 of the Agreement provides that if one or both of the Hamilton Park Defendants transfers the beneficial ownership of the majority of its outstanding equity or otherwise undergoes a change of control by reason of merger, operation of law or otherwise, the Hamilton Park Defendants shall require the new owner to assume the Agreement as part of such transaction.  Agreement §15.5.

27.     The Hamilton Park Defendants bear the responsibility to inform any potential transferee of its assignment obligation in Section 15.5 of the Agreement. Agreement §15.5.

28.     Upon information and belief, in March or April 2013, Alaris acquired the Hamilton Park Defendants (the "Acquisition").

29.     Upon information and belief, as a result of the Acquisition, the assets and liabilities of Hamilton Park were transferred to Alaris Hamilton Park and the assets and liabilities of Atrium were transferred to Alaris Atrium.

30.     Upon information and belief, the Hamilton Park Defendants informed the Alaris Defendants about the Agreement.

31.     The Hamilton Park Defendants were required by the Agreement to assign to the Alaris Defendants their obligations to Millennium.  See Agreement §15.5.

32.     Upon information and belief, the Alaris Defendants were informed or understood from due diligence or otherwise that the Hamilton Park Defendants were required by the Agreement to assign their obligations to the Alaris Defendants and to require the Alaris Defendants to assume the Agreement.

33.     Millennium received no notice in 2013 that the Hamilton Park Defendants or the Alaris Defendants elected not to extend the Agreement, thus the Agreement was automatically renewed for the period from July 15, 2013 to July 15, 2014.  Again, the Facilities continued to order and accept products and services from Millennium after July 15, 2013, in the exact same manner as before.

34.     Thereafter, on August 15, 2013, Millennium received a letter from Alaris Atrium, stating that, effective September 15, 2013, Alaris Atrium would no longer require Millennium's services (the "9/15/13 Termination Date").

35.     Millennium continued to provide products and services under the Agreement to Alaris Atrium through the 9/15/13 Termination Date.

36.     On September 1, 2013, Millennium received a letter from Alaris Hamilton Park, stating that, effective October 1, 2013, Alaris Hamilton Park would no longer require Millennium's services (the "10/1/13 Termination Date").

37.     Millennium continued to provide products and services under the Agreement to Alaris Hamilton Park through the 10/1/13 Termination Date.

38.     Under Section 8.3 of the Agreement, Millennium submitted monthly invoices for products and services provided under the terms of the Agreement, and the

invoices were required to be paid in full of those monthly invoices within sixty (60) days of the billing date. Late payments accrue interest at 1.5% per month or the greatest amount permitted by applicable law, whichever is less. Agreement, §8.3.

39. Between April 9, 2013 and October 8, 2013, Millennium sent Hamilton Park seven (7) invoices in the total amount of $867,869.46 for products and services received by Hamilton Park for the period March 2013 through September 2013 (the "Hamilton Park Invoices"), of which only $12,304.01 has been paid, leaving a balance due of $766,546.61 (the "Hamilton Park Balance").

40. At no time have the Defendants ever contested the accuracy of the Hamilton Park Invoices or their obligation to pay the charges set forth in the Hamilton Park Invoices.

41. Between March 7, 2013 and October 1, 2013, Millennium sent Atrium eight (8) invoices in the total amount of $6,474.12 (the "Atrium Balance") for products and services received by Atrium for the period February 2013 through September 2013 (the "Atrium Invoices").

42. At no time have the Defendants ever contested the accuracy of the Atrium Invoices or their obligation to pay the charges set forth in the Atrium Invoices.

43. The Agreement entitles Millennium to recover reasonable legal fees and costs incurred in collecting any amounts due and owning under the terms of the Agreement or enforcing any other provision of the Agreement. Agreement, §8.3.

## COUNT I
## Breach of Contract: Millennium v. All Defendants

44.　　Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein.

45.　　Under the terms of the Agreement, the Agreement was automatically renewed vis-à-vis the Hamilton Park Defendants for the period from July 15, 2012 to July 15, 2013.

46.　　The Agreement obligated the Hamilton Park Defendants to assign the Agreement to any potential transferee in the event of a change of beneficial ownership or control. See Agreement §15.5.

47.　　The Alaris Defendants are now attempting to terminate the Agreement in violation of the terms of the Agreement.

48.　　The Agreement is a binding and enforceable contract between Millennium, on the one hand, and the Hamilton Park Defendants and/or the Alaris Defendants, on the other.

49.　　Had the Agreement not been improperly terminated, Millennium would have earned gross profits for the period from October 2013 to July 2014 in the amount of $410,666.67.

50.　　Under the terms of the Agreement, Millennium is entitled to recover reasonable legal fees and costs incurred enforcing provisions of the Agreement. See Agreement, §8.3.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $410,666.67, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

## COUNT II
## Breach of Contract:  Millennium v. Hamilton Park and Atrium

51.    Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein.

52.    Each month, the Hamilton Park Defendants placed orders for goods and services and Millennium dispensed the orders.  The orders were delivered to the Facilities where the Hamilton Park Defendants had the opportunity to review and accept the orders.  Printed delivery receipts were signed for each order delivered to the Facilities.

53.    The Hamilton Park Defendants are contractually obligated to pay for all products and services provided by Millennium pursuant to the terms of the Agreement.

54.    Millennium fully performed all of its obligations under the Agreement.  The products and services set forth on the Hamilton Park Invoices and the Atrium Invoices were accepted by the Hamilton Park Defendants by virtue of their failure to return any portion of the orders upon delivery and/or dispute the invoices.

55.    The Hamilton Park Defendants have breached the Agreement by failing and/or refusing to pay the amounts due to Millennium as reflected in the Hamilton Park Invoices and the Atrium Invoices.

56.    The total of the Hamilton Park Balance and the Atrium Balance is $773,020.73.

57.    The unpaid balance due and owing accrues interest at the rate of 1.5% per month.  See Agreement, §8.3.

58.     Under the terms of the Agreement, Millennium is entitled to recover reasonable legal fees and costs incurred in collecting any amounts due and owning under the terms of the Agreement.  See Agreement, §8.3.

59.     Millennium has sustained damages from the Hamilton Park Defendants' breach in an amount not less than $773,020.73, plus interest accruing at the rate of 1.5% per month, and attorneys' fees.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $773,020.73, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

## COUNT III
### Account Stated:  Millennium v. Hamilton Park and Atrium

60.     Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein.

61.     The Hamilton Park Invoices and the Atrium Invoices are accurate recitations of payments owed by the Hamilton Park Defendants to Millennium for products and services provided in accordance with the terms of the Agreement.

62.     The Hamilton Park Defendants had the opportunity to scrutinize products and services delivered prior to signing the delivery receipts.

63.     In addition, the Hamilton Park Defendants were given sufficient time to review the Hamilton Park Invoices and the Atrium Invoices.  Specifically, the Agreement provided for a thirty (30)-day review period, during which the Hamilton Park Defendants were given the opportunity to dispute an invoice; such period commencing on the date of invoice.  See Agreement, §8.4.

64.     Section 8.4 of the Agreement obligates the Hamilton Park Defendants to notify Millennium in writing of any amounts in dispute within thirty (30) days of the date of the disputed invoice, and if no such notice is provided, the invoice will be deemed correct and the Hamilton Park Defendants must pay the entire amount due on the invoice, plus any applicable interest.  Agreement, §8.4.

65.     By failing to provide the notice of dispute required in Section 8.4 of the Agreement, the Hamilton Park Defendants are deemed to have accepted the Hamilton Park Invoices and the Atrium Invoices as correct.

66.     The Hamilton Park Defendants have wrongfully failed and refused to pay the Hamilton Park Balance and the Atrium Balance, despite their obligation to do so under Section 8.4 of the Agreement.

67.     Pursuant to the terms of Section 8.3 of the Agreement, Millennium is entitled to the payment of interest at the rate of 1.5% per month on all delinquent payments, as well as attorneys' fees and costs expended in efforts to collect the outstanding amount.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $773,020.73, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

## COUNT IV
## Unjust Enrichment (In the Alternative):  Millennium v. Hamilton Park and Atrium

68.     Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein

69.     As set forth more fully herein, Millennium provided, and the Hamilton Park Defendants accepted, products and services, the reasonable value of which is not less

than $773,020.73, not inclusive of contractually-provided interest and attorneys' fees, which continue to accrue.

70.     In the event Millennium is not compensated pursuant to Counts II and III for the products and services that Millennium provided to the Hamilton Park Defendants under the terms of the Agreement, the Hamilton Park Defendants would be unjustly enriched by retaining the value of such products and services without making full payment.

71.     Millennium is entitled to payment for the agreed-upon value of the products and services that it provided to the Hamilton Park Defendants and for which Millennium has not been paid.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $773,020.73, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

## COUNT V
## Breach of Contract (In the Alternative):  Millennium v. Hamilton Park and Atrium

72.     Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein.

73.     In the event of a change of beneficial ownership or control, the Agreement obligates the Hamilton Park Defendants to assign the Agreement to any transferee, and to cause the transferee to assume the Agreement as part of such transaction. See Agreement §15.5.

74.     Millennium has never been advised that the Hamilton Park Defendants failed to assign the Agreement to the Alaris Defendants and/or failed to require the

Alaris Defendants to assume the Agreement, as required by Section 15.5 of the Agreement.

75.　　Nonetheless, the Alaris Defendants are now attempting improperly to terminate the Agreement in violation of the terms of the Agreement.

76.　　The Agreement is a binding and enforceable contract between Millennium and the Hamilton Park Defendants.

77.　　Upon information and belief, the Hamilton Park Defendants breached the contract by failing to ensure that the Agreement was assigned to and assumed by the Alaris Defendants.

78.　　Had the Hamilton Park Defendants properly assigned the Agreement to the Alaris Defendants, and assured its assumption by the Alaris Defendants, as required by Section 15.5 of the Agreement, Millennium would have earned gross profits for the period from October 2013 to July 2014 in the amount of $410,666.67.

79.　　Under the terms of the Agreement, Millennium is entitled to recover reasonable legal fees and costs incurred enforcing provisions of the Agreement. See Agreement, §8.3.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $410,666.67, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

## COUNT VI
## Breach of Contract:  Millennium v. Alaris, Alaris Hamilton Park and Alaris Atrium

80.     Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein.

81.     Following the Acquisition, the Alaris Defendants continued to place orders with Millennium for the Facilities, and Millennium continued to deliver goods and services to the Facilities under the terms of the Agreement.

82.     Upon receipt of each order at the Facilities, the Alaris Defendants reviewed the orders and signed the printed delivery receipts, acknowledging the accuracy of each order and accepting the products and services provided by Millennium under the terms of the Agreement.

83.     Upon information and belief, the Alaris Defendants assumed the Agreement at the time of the Acquisition.

84.     The Alaris Defendants are contractually obligated to pay for all products and services provided by Millennium pursuant to the terms of the Agreement.

85.     Millennium fully performed all of its obligations under the Agreement.  The products and services set forth on the Hamilton Park Invoices and the Atrium Invoices were accepted by the Alaris Defendants by virtue of their failure to return any portion of the orders upon delivery and/or dispute the invoices.

86.     The Alaris Defendants have breached the Agreement by failing and/or refusing to pay the amounts due to Millennium as reflected in the Hamilton Park Invoices and the Atrium Invoices.

87.     The total of the Hamilton Park Balance and the Atrium Balance is $773,020.73.

88.     The unpaid balance due and owing accrues interest at the rate of 1.5% per month.  See Agreement, §8.3.

89.     Under the terms of the Agreement, Millennium is entitled to recover reasonable legal fees and costs incurred in collecting any amounts due and owning under the terms of the Agreement.  See Agreement, §8.3.

90.     Millennium has sustained damages from the Alaris Defendants' breach in an amount not less than $773,020.73, plus interest accruing at the rate of 1.5% per month, and attorneys' fees.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $773,020.73, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

## COUNT VII
## Account Stated:  Millennium v. Alaris, Alaris Hamilton Park and Alaris Atrium

91.     Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein.

92.     The Hamilton Park Invoices and the Atrium Invoices accurately reflect the payments owed by the Alaris Defendants to Millennium for products and services provided to the Facilities in accordance with the terms of the Agreement.

93.     The Alaris Defendants were given the opportunity to review the products and services delivered by Millennium prior to signing the delivery receipts.

94.     In addition, pursuant to the terms of the Agreement, the Alaris Defendants had a thirty (30)-day period to dispute the Hamilton Park Invoices and/or the Atrium invoices; such period commencing on the date of invoice.  See Agreement, §8.4.

95.    By failing to provide notice of any disputed charges as required in Section 8.4 of the Agreement, the Alaris Defendants are deemed to have accepted the Hamilton Park Invoices and the Atrium Invoices as correct.

96.    The Alaris Defendants have wrongfully failed and refused to pay the Hamilton Park Balance and the Atrium Balance, despite their obligation to do so under Section 8.4 of the Agreement.

97.    Pursuant to the terms of Section 8.3 of the Agreement, Millennium is entitled to the payment of interest at the rate of 1.5% per month on all delinquent payments, as well as attorneys' fees and costs expended in efforts to collect the outstanding amount.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $773,020.73, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

**COUNT VIII**
**Successor Liability (In the Alternative):  Millennium v. Alaris, Alaris Hamilton Park and Alaris Atrium**

98.    Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein.

99.    The Agreement is binding on all parties' successors. See Agreement, §15.4.

100.    Alaris Hamilton Park and Alaris Atrium are the exact same Facilities operated by the Hamilton Park Defendants; i.e., the personnel, physical plant and patient-consumers/residents did not change, except for normal turnover, after the Acquisition.

101.   Moreover, as set forth in further detail herein, following the Acquisition, the Alaris Defendants conducted at the Facilities the same operations as did the Hamilton Park Defendants before the Acquisition in essentially an unchanged manner, particularly with respect to their relationship and business practices with Millennium. Specifically, the Alaris Defendants continued to place orders for products and services in accordance with the terms of the Agreement, and to review, accept and sign for deliveries of products and services from Millennium.

102.   Even if the Alaris Defendants did not assume the Agreement pursuant to Section 15.5 of the Agreement, they are subject to the Agreement as the legal successors to the Hamilton Park Defendants.

103.   Following the Acquisition, the Alaris Defendants failed to elect not to renew the Agreement pursuant to Section 9.2 of the Agreement, therefore the Agreement automatically renewed for the period from July 15, 2013 to July 15, 2014.

104.   The Alaris Defendants are now attempting to terminate the Agreement in violation of the terms of the Agreement.

105.   The Agreement is a binding and enforceable contract between Millennium and the Alaris Defendants under the theory of successor liability.

106.   Had the Agreement not been improperly terminated, Millennium would have earned gross profits for the period from October 2013 to July 2014 in the amount of $410,666.67.

107.   Under the terms of the Agreement, Millennium is entitled to recover reasonable legal fees and costs incurred enforcing provisions of the Agreement. See Agreement, §8.3.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $410,666.67, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

## COUNT IX
### Unjust Enrichment (In the Alternative):  Millennium v. Alaris, Alaris Hamilton Park and Alaris Atrium

108.    Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein

109.    As set forth more fully herein, Millennium provided, and the Alaris Defendants accepted, products and services, the reasonable value of which is not less than $773,020.73, not inclusive of contractually-provided interest and attorneys' fees, which continue to accrue.

110.    To the extent Millennium is not otherwise compensated hereunder for the products and services that Millennium provided to the Alaris Defendants under the terms of the Agreement, the Alaris Defendants would be unjustly enriched by retaining the value of such products and services without making full payment.

111.    Millennium is entitled to payment for the value of the products and services that it provided to the Alaris Defendants and for which Millennium has not been paid.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $773,020.73, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

## COUNT X
## Negligent Misrepresentation: Millennium v. Alaris, Alaris Hamilton Park and Alaris Atrium

112.   Millennium repeats and restates the averments set forth in the preceding paragraphs as though set forth at length herein

113.   Section 15.5 of the Agreement provides that in the event the Hamilton Park Defendants transfer beneficial ownership or undergo a change of control, they are obligated to require the new owner to assume the Agreement and to inform the new owner of this requirement as part of any such transaction. See Agreement §15.5.

114.   The Alaris Defendants knew or should have known of the Hamilton Park Defendants' obligation under Section 15.5 of the Agreement to cause the Alaris Defendants to assume the Agreement as part of the Acquisition.

115.   Upon information and belief, the Alaris Defendants engaged in some degree of due diligence prior to the Acquisition, during which they received and reviewed the terms of the Agreement.

116.   Following the Acquisition, the Alaris Defendants continued to act in accordance with the provisions of the Agreement and to order and accept services and products in accordance with the terms of the Agreement.

117.   If the Alaris Defendants desired not to continue to receive products and services under the Agreement, an election not to renew the Agreement term should have been made under Section 9.2 of the Agreement prior to July 15, 2013.

118.   In order to prevent the Agreement from automatically renewing, an election pursuant to Section 9.2 of the Agreement is required. Following the Acquisition, the Alaris Defendants were required to make an election not to renew the

Agreement prior to July 15, 2013 in order to avoid the automatic extension of the Agreement term. The Alaris Defendants failed to make such an election, thus the Agreement term was renewed for the period from July 15, 2013 to July 15, 2014.

119. Following the Acquisition, the Alaris Defendants' actions in (a) continuing to order products and services from Millennium, (b) continuing to review, accept and sign for deliveries of products and services delivered by Millennium, and (c) failing to make an election not to renew the Agreement, constitute misrepresentations by omissions intended to mislead Millennium into continuing to provide products and services.

120. Millennium relied on the misrepresentations of the Alaris Defendants.

121. As a direct and proximate result of the omissions which constituted misrepresentations of the Alaris Defendants, Millennium continued to provide products and services under the terms of the Agreement.

122. Despite their knowledge of the Agreement, the Alaris Defendants have failed and/or refused to pay the amounts due to Millennium as reflected in the Hamilton Park Invoices and the Atrium Invoices, the balances from which total $773,020.73.

123. Despite their knowledge of the Agreement and the requirements of Section 15.5 thereof, the Alaris Defendants are now attempting to terminate the Agreement in violation of the terms of the Agreement.

124. Termination of the Agreement will result in Millennium's loss of $410,666.67 in estimated profits for the period from October 2013 to July 2014.

125. The Agreement entitles Millennium to recover reasonable legal fees and costs incurred in collecting any amounts due and owning under the terms of the Agreement or enforcing any other provision of the Agreement. <u>See</u> Agreement, §8.3.

WHEREFORE, Millennium demands judgment be entered in its favor for damages in the amount of $1,183,687.40, together with the costs of this suit, attorneys' fees, and all other relief the Court deems proper.

Dated: November 5, 2013

> Respectfully submitted,
>
> FOX ROTHSCHILD LLP
>
> By: _____
> John R. Gotaskie, Jr., Esquire
> Pa ID No. 81143
> Rebecca L. Hagan, Esquire
> Pa ID No. 216418
> 625 Liberty Avenue, 29th Floor
> Pittsburgh, PA 15222
>
> *Counsel for Plaintiff*

## VERIFICATION

I, Lena Sturgeon, Executive Vice President of Millennium Pharmacy Systems, Inc., verify that the statements made herein are true and correct to the best of my knowledge, information and belief, and that I am authorized to make them. I understand that the statements made herein are made subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.

Dated: November 4, 2013

Lena Sturgeon



# PHARMACY SERVICES AGREEMENT

## For

## HAMILTON PARK HEALTH CARE CENTER, LTD and THE ATRIUM AT HAMILTON PARK



**EXHIBIT**

A

**Millennium Pharmacy Systems, Inc.**

# PHARMACY SERVICES AGREEMENT

THIS PHARMACY SERVICES AGREEMENT ("Agreement") dated July 15, 2010 ("Effective Date") between MILLENNIUM PHARMACY SYSTEMS, INC., a Delaware corporation ("MPS") and HAMILTON PARK HEALTH CARE CENTER, LTD and THE ATRIUM AT HAMILTON PARK ("Customer").

## RECITALS

A.    Customer is engaged in the operation of one or more nursing home facilities for which it requires MPS services.

B.    MPS provides full-service pharmacy solutions to nursing home facilities.

C.    Customer desires to utilize MPS' services, and MPS is willing to furnish the services as provided herein.

## AGREEMENT

Accordingly, intending to be legally bound, Customer and MPS agree as follows:

**1.    SERVICES**

1.1    Services.    For the benefit of Customer, MPS shall provide the services ("Services") set forth on Exhibit A and Exhibit D at the Customer locations ("Customer (s)") indicated on Exhibit A and Exhibit D; as such Exhibit is amended from time to time upon mutual consent of the parties.

1.2    Additional Services.    Customer may elect additional services as set forth in additional Exhibits to this Agreement, and upon mutual written consent of the parties, those additional services will be deemed to be a part of the Services.

**2.    SUPPLY OF MEDICAL PRODUCTS**

2.1    Drugs and Supplies.    As part of the Services, MPS shall provide to Customer the following services:

a.    Supply drugs, intravenous solutions, biological and pharmaceutical supplies ("Medical Products") in compliance with applicable local, state and federal laws and regulations for residents and Customer, as ordered by Customer's employees through the System;

b.    Label all medications supplied to Customer in accordance with local, state and federal laws, rules and regulations;

c.    Provide Customer in a prompt and timely manner with Medical Products as ordered by Customer's employees through the System; and

d.    Maintain drug profiles, consistent with the information provided to MPS on each Customer resident served by MPS.

2.2    Delivery Schedule.    MPS shall deliver to Customer any Medical Products on a mutually agreeable basis with additional deliveries if emergencies arise, except under circumstances and conditions beyond MPS' control, which include, but are not limited to, situations where MPS' manufacturer or supplier fails or is unable to provide the required item and a reasonable, acceptable alternative is not available to MPS.  MPS shall notify Customer as soon as reasonably possible if MPS is unable to deliver prescriptions and supplies that have been ordered by Customer.

2.3    Emergency Drug Services.    MPS shall provide any Medical Products needed on an emergency basis in a prompt and timely manner.  Emergency delivery will be available 24 hours a day/7 days per week and delivery will

occur within three hours of the order being placed with MPS. If MPS cannot furnish an ordered Medical Product within three hours, MPS shall use reasonable efforts to make arrangements with another pharmacy supplier in a community local to Customer to provide such service(s) to Customer. MPS shall notify Customer of any such arrangement as soon as reasonably possible. Emergency deliveries provided to Customer as a result of Customer's failure to notify MPS of ordered and/or reordered Medical Product needs in accordance with electronic ordering and/or reordering procedures and refusal to access Medical Product inventory in the onsite Med Dispense system shall be billed to Customer at $250.00 per delivery.

2.4    Physician Order Records and Medication Administration Records. MPS shall provide Customer with the capability for generating Physician Order Records and Medication Administration Records through the System; as such terms are defined in the System.

2.5    Billing. MPS shall perform billing for all Medical Products provided to private pay residents and residents whose Medical Products is reimbursed by a third party payor (e.g., private insurance, Medicare or Medicaid). If Customer is in compliance with Section 6.5 below, Customer shall not be responsible for payment of any Medical Products provided to private pay residents and residents whose Medical Products is reimbursed by a third party payor. In all other instances, including those where MPS does not bill directly to a third party or Customer provides the wrong information or late information, MPS may bill Customer (and Customer shall pay MPS) for the Medical Products and any related late fees or charges.

2.6    Attendance at Meetings. MPS shall ensure that a representative from MPS is available for attendance at Customer's quality assurance committee meetings, the infectious disease or infection control committee meetings and any other committee meetings held during regularly scheduled visits to Customer as mutually agreed upon by MPS and Customer. MPS may participate in such meetings in person or through telephonic means.

2.7    Service Guarantees. If MPS fails to meet the service guarantee standards set forth in Schedule 2.7, then the fees owed MPS by Customer shall be reduced by the amounts shown in Schedule 2.7

3.    **LICENSE OF TECHNOLOGY**

3.1    License. Subject to the terms and conditions of this Agreement, MPS hereby grants to Customer, and Customer hereby accepts, a limited, non-exclusive license to use the Technology during the Term (as defined in Section 9.2 below) solely at the Customer (s) in connection with Customer's use of the System. **"Technology"** means MPS' technical information, patents, inventions, techniques, equipment specifications, and related know-how, technical knowledge, trade secrets and experience which is embedded in the System or used as part of the Services, including (a) any object code to the software embodied in the System including the MPSRx software, (b) the documentation provided by MPS in connection with the System and the Equipment (as defined in Section 4 below), including without limitation the Policies and Procedures Manuals (the **"Documentation"**), (c) the technology used to provide the MPSRx Site, and (d) any modifications, derivatives, improvements, enhancements or extensions to the foregoing provided by MPS hereunder. **"System"** means MPS' system comprised of the Equipment and the Technology. **"MPSRx Site"** means the website MPS designates for the Services.

3.2    Title. All Intellectual Property Rights in and to the Technology and any modifications or alterations thereto remain the exclusive property of MPS. Except as expressly provided in this Agreement, MPS grants no other rights or licenses to the Technology. Without limiting the generality of the above, MPS reserves unto itself all Intellectual Property Rights in and to any invention, software, trade secrets or other developments incorporated as a part of the Services or otherwise conceived or reduced to practice in the performance of this Agreement by either party. **"Intellectual Property Rights"** means any and all intellectual property rights related to the System, including

procedures, designs, inventions, discoveries, know-how, show-how and works of authorship, and all United States and foreign patents issued or issuable thereon, all copyrights and other rights in works of authorship, mask work rights, trade secrets, trademarks, trade names, and other forms of corporate or product identification, and any divisions, continuation, modification, enhancements, or derivative works or licenses of any of the foregoing. In the event any Intellectual Property Rights are created by an employee or agent of Customer, Customer shall cooperate with MPS to properly ensure title to such Intellectual Property Right is transferred to MPS, including the execution of such documents as MPS may reasonably request

3.3 Restrictions. Customer shall not (a) sublicense, rent, lease, dispose of, distribute, or otherwise convey the Technology or Documentation; (b) assign or otherwise transfer any right or delegate any duty or any license granted hereunder to any third party; (c) alter, maintain, enhance, modify, translate, reverse engineer, decompile or disassemble the Technology, in whole or in part, or create derivative works based on the Technology; (d) alter or remove any copyright, trade secret, patent, trademark, proprietary and/or other legal notice contained on or in copies of the Technology; or (e) make copies or duplicates the Technology, the Documentation, or any components thereof without the prior written consent of MPS. Any sale, conveyance, license, or transfer of any part of the Equipment which embodies the Technology to any third party, without the prior written consent of MPS or the removal by MPS of the Technology from the applicable part of the Equipment, shall be a material breach of this Agreement.

3.4 Third Party Licenses. Customer shall accept and comply with the terms and conditions of licenses or sublicenses of third party vendors whose software is incorporated into the System that may be required as a condition to the use and operation of the Equipment.

4. EQUIPMENT LEASE. MPS shall provide to Customer the medication carts and related equipment ("Equipment") necessary for

effective use of the System during the Term, as well as related maintenance and repairs, as described on Exhibit B. Customer shall comply with the additional terms and conditions set forth on Exhibit B with respect to the Equipment.

5. HOSTED SITE

5.1 Access to MPSRx Site. Subject to the terms and conditions of this Agreement, MPS hereby grants to Customer rights to access and use the MPSRx Site by those users who have been trained in accordance with Section 7.1 for Customer's internal use only.

5.2 Customer's Access Requirements. Unless otherwise specified on Exhibit B, Customer is solely responsible for acquiring and maintaining (a) an appropriate link from Customer to the Internet, and (b) all computer hardware and software sufficient to access and use the MPSRx Site. Unless otherwise specified on Exhibit B, Customer shall also be solely responsible for acquiring and maintaining technology and procedures for maintaining the security of its link to the Internet.

6. RESPONSIBILITIES OF CUSTOMER

6.1 Regulatory Compliance. During the Term, Customer shall be and remain consistently in substantial compliance with all federal, state and local laws, rules, regulations, directives and orders affecting the health, safety and well-being of its residents, shall maintain adequate and accurate medical records of and for its residents, and shall adhere to proper procedures for ordering Medical Products for its residents.

6.2 Operational. Customer shall be responsible for the implementation of and compliance with MPS' Policies and Procedures upon the commencement of this Agreement, except for those MPS Policies and Procedures which may, in the reasonable discretion of Customer, have a negative impact on the quality of care provided to Customer residents. MPS shall be responsible for providing Customer with accurate and current Policies and Procedures. MPS may amend its Policies and Procedures from time to time, in its sole discretion, and upon delivery of the amended Policies and

Procedures to Customer, Customer shall be responsible for their implementation. In addition, Customer shall make available to MPS adequate working and storage space to allow MPS to fulfill the Services, including, but not limited to, adequate space at each nursing station for the storage of medication carts, containers or cards and other Equipment to be provided by MPS.

6.3     Residents' Right to Choose. Customer shall comply with all applicable federal, state and local laws and regulations regarding a resident's right to choose his or her own pharmacy.

6.4     Ordering. Customer shall order exclusively from MPS all Medical Products for individual residents which are not commonly stocked in a Customer, except in cases where a resident has chosen to purchase Medical Products from another pharmacy, in which case the residents' choice shall be honored. Customer shall also purchase "house supply" Medical Products from MPS, as allowed by applicable local, state and federal laws regulations. Notwithstanding the above, Customer shall have the right to order Medical Products from a third party provider if Customer, in its sole judgment, deems such a step necessary to maintain the health, safety and welfare of its residents. If Customer orders any Medical Products from a third party provider, Customer shall notify MPS of that action and provide the reasons that it took such action. Thereafter, Customer and MPS shall work together to resolve any issues that may have compelled Customer to order from a third party provider.

6.5     Billing     Data     and Reimbursement Status.

(a)     Customer shall provide MPS with the necessary billing data, including, but not limited to, Medicare and Medicaid numbers, other third-party payers and their billing information, resident name, responsible party, billing address, phone number, physician names and any other pertinent data as required by MPS to provide the Services. Customer must input this information through the System at time of admission and on the date of any change.

(b)     Customer shall advise and notify MPS of each resident's sources of reimbursement for Medical Products. Customer shall notify MPS through the System on the effective date of any changes in resident medications following receipt of physicians' orders, upon changes of room, transfer or discharge, or upon a change in payor. Customer shall give MPS reasonable access to all resident records, facilities and supplies necessary for the performance of MPS' duties under this Agreement, and MPS shall furnish to Customer, upon request, all information relating to the Medical Products furnished to Customer or to Customer residents.

(c)     Customer shall be responsible for obtaining proper execution of appropriate billing consents with respect to each resident for which MPS shall perform billing, and shall furnish MPS with copies of all such consents.

6.6     Policies     and     Procedures Regarding Usage of Outside Pharmacies. In order to ensure proper medical care, consistent and cost-effective Services, and lower risk of medication errors, Customer shall require all outside pharmacies selected by residents to comply with Customer's policies and procedures for the dispensing of products to Customer residents. Customer shall require that each resident electing to use a pharmacy other than MPS specify such election in writing, and Customer shall provide a copy of such election to MPS. MPS shall have no responsibility for any such resident. To enhance patient safety, all products from outside pharmacies must be entered into the System and dispensed in accordance with System procedures.

6.7     Customer     and     Personnel Access. Customer hereby grants MPS reasonable access to the Customer (s) and personnel concerned with the operation of the System and maintenance of the Equipment at all times reasonably requested by MPS for the purpose of providing the Services.

7.     TRAINING

7.1     Training. MPS shall provide, as part of the Services, training for MPS software embodied in the System for key clinical staff as

outlined in Exhibit C. Customer shall ensure that (a) qualified System administrators attend and successfully complete MPS' System training, and (b) all other users of the System attend and successfully complete training by a System administrator prior to any use of the System.

7.2 Additional Training. Upon request of Customer's administrator, and as mutually agreed to by MPS and Customer, MPS shall present programs for inservice education on subjects related to the pharmaceutical services, with such programs to be conducted by a pharmacist or his/her designee during regularly scheduled visits to Customer. In addition, Customer may request additional training on the System, which the parties shall schedule as mutually convenient. MPS provides such programs and training to Customer for additional fees, which amounts shall be provided to Customer upon request.

8. BILLING

8.1 Fees and Charges. MPS' fees and charges are set forth on the fee schedule attached hereto as Exhibit D and will be billed to Customer at those rates. MPS may amend the fee schedule upon giving Customer at least 60 days' prior written notice of the rate changes.

8.2 State Increases. Customer recognizes and acknowledges that MPS' fees and charges cannot be less than the fees and charges approved by the applicable state in which the Customer is located for payment through Medicaid and/or acquisition costs. Accordingly, should that state, at any time during the Term increase its Medicaid fee structure for any of the goods or services provided to Customer by MPS to an amount in excess of MPS' then fees and charges, the amount charged by and due to MPS shall be automatically increased to an amount equal to the approved Medicaid fee or charge.

8.3 Invoices. MPS shall submit a monthly invoice to Customer for Medical Products and Services provided under this Agreement. Customer shall remit payment in full within 60 days of the billing date of MPS' invoice. Unpaid amounts will bear interest at

the lessor of 1.5% per month or the greatest amount permitted by applicable law. Payments will be applied to interest and late charge penalties first and then any remainder will be applied to the principal sum. MPS shall be entitled to recover from Customer reasonable legal fees and costs incurred in collecting any sums owed by Customer to MPS or enforcing any other provision of this Agreement. If Customer is in default of this Section 8.3, MPS may request, and Customer shall provide, Customer financial information, including without limitation, those financial statements customarily provided to third party lenders.

8.4 Disputed Amounts. Customer shall notify MPS within 30 days of the date of MPS' invoice of any amounts in dispute. In the event of any dispute arising from any claim or bill submitted by MPS, MPS shall have access to all related documents and records that would, in the discretion of MPS, have bearing on its claim. Where Customer is an intermediary in the processing of claims, Customer shall promptly furnish to MPS any information regarding the status of the claim and shall grant to any agency or entity involved in the payment or dispute the right to discuss the status of the claim with MPS. If Customer does not provide MPS with written notice that it disputes an amount due on an invoice within 30 days of invoice date, the invoice will be deemed correct and Customer must pay the entire amount due on the invoice (plus any interest if applicable).

8.5 Taxes. Customer shall bear, pay, and reimburse MPS for all sales, use, value added or other taxes, federal, state, or local, however designated, that are levied or imposed by reason of the transactions contemplated by this Agreement, other than taxes based on MPS' net income and taxes based on pass-through sales of goods (e.g., drugs and medical supplies) to residents of the Customer. If and to the extent applicable, Customer shall provide MPS with one or more certificates evidencing that Customer is exempt from sales and use taxes.

8.6 Access to Records. Until the expiration of 10 years after the termination of this Agreement, MPS shall make available, upon written request of the Secretary of the United

States Department of Health and Human Services or upon request of the Comptroller General of the United States General Accounting Office or any of their duly authorized representatives, a copy of this Agreement and such books, documents, and records as are necessary to certify the nature and extent of the costs of the Services provided by MPS under this Agreement.

## 9. TERM AND TERMINATION

9.1     Inspection Period.     Beginning on the Effective Date, MPS shall have a period of up to 30 days ("**Inspection Period**") within which to inspect Customer and examine its relevant records, procedures and operations for regulatory compliance, a satisfactory level or standard of practice and care, and compatibility of operations with the MPS Services.     The Inspection Period is for the sole use and benefit of MPS and no other persons or entities are intended to be benefited by, nor may they rely upon, the results of that inspection or any information obtained in that inspection or conclusions drawn from that inspection.     MPS shall use any information gathered during the Inspection Period solely for the purposes set forth herein and shall not disclose the information to any third-party without the express written consent of Customer.     MPS shall not provide, and Customer shall not order, Medical Products during the Inspection Period. MPS has the right to terminate this Agreement upon written notice to Customer within five business days following completion of the Inspection Period if MPS determines in its sole and absolute discretion that the Customer does not meet the inspection requirements.     If MPS exercises the right of termination under this Section 9.1, Customer shall owe no fees or charges for any Services or the System, and Customer waives any right to make a claim for losses solely arising out of, or in connection with such termination.     If MPS does not terminate this Agreement upon completion of the Inspection Period, it shall notify Customer of the date on which Services will commence ("**Services Commencement Date**").

9.2     Initial and Renewal Terms.     The term of this Agreement commences on the Effective Date and continues until the **[second]** anniversary of the Services Commencement Date ("**Initial Term**").     This Agreement will automatically extend for additional periods of one year each (each, a "**Renewal Term**") upon the expiration of the Initial Term and each Renewal Term, unless either party notifies the other in writing no less than 90 days prior to the expiration of such Initial Term or Renewal Term, time being of the essence, of its election not to extend the term for such addition period. The Initial Term and all Renewal Terms are collectively, the "**Term.**"

9.3     Termination for Default.     If either party defaults in the performance of its obligations under this Agreement and the default is not cured within 90 days of the receipt of written notice (or 10 days in the case of an obligation to pay money or a default by Customer in its obligations to meet regulatory requirements and standards or to comply with MPS' Policies and Procedures, which default, in the reasonable judgment of MPS, poses a risk to the health, safety or well-being of any residents), then the non-defaulting party shall have the right, in addition to any other rights it may have, to terminate this Agreement, by written notice to the defaulting party, on any future date not less than 10 days from the date of such notice.

9.4     Change in Law.     Each party to this Agreement is solely responsible for monitoring legal developments applicable to it and developing appropriate compliance programs with respect thereto.     If either party reasonably determines that this Agreement cannot be performed without violating laws, rules, regulations or administrative policies of applicable federal, state or local regulatory authorities or compliance with such legal requirements would be unduly burdensome or costly, the parties will make good faith efforts to modify this Agreement to ensure that compliance is not unduly burdensome or costly. If the parties cannot mutually agree on a modification within 30 days, either party will have the right to terminate this Agreement upon 60 days' written notice to the other party.

9.5     Obligations Upon Expiration or Termination.     Upon expiration or sooner

termination of this Agreement, Customer shall permit MPS to remove all of the Equipment and Technology, formulary Documentation, Policies and Procedures Manuals, forms, emergency kits and any information, or other property belonging to MPS. Following termination, MPS shall provide Customer with a copy of its data in a machine-readable format. Termination of this Agreement shall not relieve either party from liability for any breach of this Agreement occurring prior to the effective date of that termination.

## 10. REPRESENTATIONS OF THE PARTIES

10.1 Mutual. Each of the parties to this Agreement, as to itself, represents to the other as follows: (a) the party is a corporation or other recognized legal business or entity duly organized, validly existing, and in good standing or subsisting under the laws of the state of its formation and is duly licensed or qualified to do business in each jurisdiction in which it operates; (b) the party has the corporate power and legal authority to enter into this Agreement and to perform its obligations hereunder and has taken all necessary corporate or other action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder; (c) the party has all of the necessary qualifications, and has received all required consents, approvals and authorizations, including but not limited to, certificates, permits, registrations, and licenses, pursuant to federal, state and local laws and regulations to perform its obligations under this Agreement; and (d) the execution and delivery of this Agreement and the performance of the party's obligations hereunder do not conflict with or violate any requirement of applicable laws or regulations or conflict with, or constitute a default under, any contractual obligation of that party, including contractual obligations with any other pharmacy provider.

10.2 Compliance with Anti-Kickback Laws and Regulations. The parties do not intend for any Services or access to the System provided under this Agreement to be an offer or payment of cash or any other form of remuneration, whether directly or indirectly, overtly or covertly, for patient referrals or for recommending or arranging the purchase, lease, or order of any item or service. The parties acknowledge that any resident referrals will be based solely on the assessment of each resident's health care needs, care plan, and the expressed preferences of each resident. The parties acknowledge that any business referral will be based solely on the legitimate and lawful needs of the organization. The parties acknowledge that all amounts paid under this Agreement are intended to, and do, reflect the fair market value of the Services rendered and the Equipment provided. It is specifically acknowledged by the parties that no amount paid, or to be paid, hereunder is intended to be an inducement or payment for the referral of patients or for recommending or arranging the purchase, lease, or order of any item or service.

10.3 Eligibility. The parties to this Agreement hereby attest that they are NOT currently excluded, suspended, debarred, or otherwise ineligible to participate in the Federal health care programs and have NOT been convicted of a criminal offence related to the provision of health care items or services. It is the affirmative obligation of the parties to this Agreement to inform the other party in writing if it becomes ineligible to participate in Federal health care programs as described above.

## 11. LIMITED WARRANTY

11.1 Warranty. MPS warrants solely to Customer that: (a) it has developed, owns, or possesses all rights and interests in the Services and the System necessary to enter into this Agreement, (b) it has full authority to execute and perform this Agreement, and (c) the execution and performance of this Agreement by MPS shall not violate any local, state and federal laws and regulations, community standards of practice, or breach any other agreement known by MPS. Customer acknowledges that MPS may use third-party service providers in the performance of the Services.

11.2 Disclaimer. EXCEPT AS SPECIFIED IN SECTION 11.1, MPS MAKES NO WARRANTIES IN RESPECT OF ANY MATTER, INCLUDING WITHOUT LIMITATION THE SERVICES, THE

MEDICAL PRODUCTS AND THE SYSTEM, AND EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OR CONDITION OF MERCHANTABILITY, THE IMPLIED WARRANTY AGAINST INFRINGEMENT, AND THE IMPLIED WARRANTY OR CONDITION OF FITNESS FOR A PARTICULAR PURPOSE. MPS SHALL NOT BE RESPONSIBLE FOR ANY THIRD PARTY'S SOFTWARE, SERVICE OR HARDWARE MPS PROVIDES OR USES IN THE PERFORMANCE OF THE SERVICES UNDER THIS AGREEMENT. MPS DOES NOT WARRANT THAT (A) THE OPERATION OF THE SERVICES OR THE SYSTEM WILL BE UNINTERRUPTED OR ERROR FREE, OR (B) ANY DEFECT OR MALFUNCTION IN THE SERVICES, THE PRODUCTS OR THE SYSTEM IS CORRECTABLE OR WILL BE CORRECTED.

## 12.    LIMITATION OF LIABILITY

12.1    Direct Damages. In no event shall MPS' aggregate liability for any and all claims, losses or damages arising out of or relating to this Agreement or any Services or the System exceed the sum of the highest fees paid by Customer during the 12 months preceding the event giving rise to the claim.

12.2    Consequential Damages. Under no circumstances shall MPS be liable for special, incidental or consequential damages, including, without limitation, lost profit or loss resulting from business interruption even if MPS has been advised of the possibility or likelihood of such damages. MPS shall not be liable for any delay, loss or damage attributable to any service, product or action of any person other than MPS and its employees and agents.

12.3    Basis of the Bargain. The parties acknowledge that MPS has set its prices and entered into this Agreement in reliance upon the limitations of liability and the disclaimers of warranties and damages set forth in this Agreement. The parties agree that the limitation and exclusions of liability and disclaimers specified in this Agreement will survive termination of this Agreement and apply even if found to have failed of their essential purpose.

All claims against MPS must be brought within one year after the cause of action arises and Customer expressly waives any statute of limitations which might apply by operation of law or otherwise.

## 13.    INDEMNIFICATION    AND INSURANCE

13.1    Intellectual    Property Infringement. If use of the Technology becomes the subject of a claim of U.S. patent, copyright or trade secret infringement, MPS shall, at its option (a) obtain for Customer the right to continue to use the Technology; (b) modify the Technology to make it non-infringing; or (c) terminate this Agreement upon written notice to Customer. MPS shall indemnify Customer for all liabilities to third parties incurred by Customer arising solely out of claims brought by third parties that the use of the Technology in accordance with this Agreement constitutes an infringement of the intellectual property right of such third parties, provided that Customer gives MPS immediate notice in writing of a claim, permits MPS to defend the same and gives MPS all available information, assistance and authority in connection therewith. MPS shall have control of the defense of any such proceeding, including appeals and of all negotiations for, including the right to effect, settlement or compromise thereof. The foregoing indemnification is contingent upon proper use of the System and adherence to MPS recommendations, and does not cover any Technology that has been modified except by MPS. MPS shall not have any liability to Customer if any such infringement, or claim thereof, is based upon or arises out of (i) compliance with the design, plans, or specifications furnished by or on behalf of Customer; (ii) the use of software or hardware not used or supplied by MPS; (iii) the use of the System in a manner for which the same was neither designated nor contemplated or is not recommended by MPS; or (iv) the claimed infringement of any patent in which Customer or any subsidiary or affiliate of Customer has any direct or indirect interest, by license or otherwise. The foregoing states the entire liability of MPS for or resulting from such infringement or claim thereof.

13.2  Indemnification of MPS. Except with respect to the gross negligence or willful misconduct of MPS, Customer shall indemnify, defend, and hold harmless MPS from and against any and all claims, liabilities (including negligence, tort and strict liability), demands, actions, suits, and proceedings, losses, costs, expenses and damages, including reasonable attorneys' fees and costs (collectively, "**Claims**"), arising out of, connected with, or resulting from this Agreement, the System or the Services, and including any Claims relating to the manufacture, selection, purchase, delivery, possession, condition, use, operation, return, or other disposition of the System, with the exception of Claims related to the infringement of intellectual property, as set forth in Section 13.1. Customer shall give MPS prompt written notice of any Claim of which it becomes aware.

13.3  Insurance.  Customer shall maintain property insurance insuring the System for full replacement value against loss, theft, damage and destruction and naming MPS and any assignee as sole loss payee, and general public liability and third party insurance, including products/completed operations liability insurance, covering property damage, death and personal injury that may result from the use and operation of the System during the Term, naming MPS and any assignee as additional insured.  The amount of general liability insurance shall not be less than $3,000,000 per occurrence.  Customer shall increase the amount of such general liability insurance to remain current with amounts customarily carried against such risks in the medical field.  Such insurance obligation of Customer shall survive the expiration or termination of this Agreement with regard to claims which relate back to events occurring during the Term.

14.  **CONFIDENTIALITY**

14.1  Confidential Information. Each party to this Agreement shall hold all Confidential Information of the other in strict confidence and shall not directly or indirectly use (other than for that party's purposes as permitted under this Agreement), copy, transfer or disclose any Confidential Information of the other, unless specifically authorized by the disclosing party in writing.  "**Confidential Information**" means any secret, proprietary or confidential information of or relating to the disclosing party which is not generally available to the public, including, all technical information, methods, know-how, formulae, processes, discoveries, inventions or research, business information, Documentation, and information which the disclosing party treats as confidential.  Customer acknowledges that the System embodies Confidential Information.  Customer acknowledges that if it seeks assistance from any third party with respect to the use of the System, it shall inform MPS in advance of the proposed assistance and the identity of such third party, and shall obtain MPS' prior written consent to such assistance. Customer shall require the third party and each of its employees granted access to the System to execute a confidentiality agreement in form and substance satisfactory to MPS.

14.2  HIPAA Requirements.  Each party shall comply with all applicable laws and regulations relating to protected health information, patient data, and privacy. Neither party shall use or further disclose any protected health information, as defined in 42 CFR Part 164, or individual health information as defined in 42 CFR Part 142 (collectively, the "**Protected Health Information**"), concerning a patient other than as permitted by this Agreement and the requirements of the federal privacy regulations as contained in 42 CFR Part 164 (the "**Federal Privacy Regulations**") and the federal security standards as contained in 42 CFR Part 142 (the "**Federal Security Regulations**").  Each party shall implement appropriate safeguards to prevent the use or disclosure of a patient's Protected Health Information other than as provided for by this Agreement.  Each party shall promptly report to the other any use or disclosure of a patient's Protected Health Information not provided for by this Agreement of which such party becomes aware.  Each party shall make its internal practices, books, and records relating to the use and disclosure of a patient's Protected Health Information available to the Secretary to the extent required for determining compliance with the Federal

Privacy Regulations and the Federal Security Regulations. Notwithstanding the foregoing, no attorney-client, accountant-client, of other legal privilege shall be deemed waived by either party by virtue of this Section.

14.3 Business Associate Agreement. The parties shall execute and deliver any documents required to comply with the federal and state privacy laws, including, if applicable, the HIPAA Business Associate Agreement attached hereto as Exhibit E. (In the event of any conflict or inconsistency between the terms of such Business Associate Agreement and the terms set forth herein, the terms set forth in the Business Associate Agreement will take precedence and control). If the parties are unable to mutually agree on an appropriate compliance methodology or approach, or if the rules and regulations related to HIPAA or other privacy laws impose further obligations on either party with regard to Confidential Information, then the parties shall meet in good faith (in person or via telephone) to discuss the impact of such additional obligations and to negotiate modifications or additions to this Agreement in order to achieve compliance with the applicable privacy laws.

## 15. MISCELLANEOUS

15.1 Status of Parties. Neither MPS nor Customer is, or shall be, for any purpose an agent, partner or employee of the other. This Agreement does not constitute a joint venture between the parties. In performing the Services, MPS, its employees and agents shall, at all times, be an independent contractor to Customer and its residents.

15.2 Force Majeure. If either party fails to perform its obligations hereunder (except for the obligation to pay money) because of strikes, accidents, acts of God, weather conditions, or action or inaction of any government body or other proper authority or other causes beyond its control, then such failure to perform shall not be deemed a default hereunder and shall be excused without penalty until such time as the affected party is capable of performing.

15.3 Notices. Notices under this Agreement shall be given to the respective party in writing either by personal delivery, by registered or certified mail, postage prepaid, or by overnight delivery to the address designated below the signature line of this Agreement or at such other addresses and persons as either party may from time to time designate by notice given as herein provided. Such notices or communications shall be deemed to have been given three days after deposit in the United States mail or one day after delivery to an overnight delivery service.

15.4 Successors; No Third Party Beneficiaries. This Agreement is binding upon and adheres to the benefit of both parties and their successors and permitted assigns. Nothing in this Agreement is intended nor shall be deemed to confer any benefits on any third party.

15.5 Assignment. This Agreement or any right or obligations hereunder may not be assigned by Customer without the prior written consent of MPS, provided, however that Customer may assign it without the consent of MPS to any affiliate of Customer so long as such affiliate maintains the operation of each Customer in substantially the same manner as Customer. If Customer transfers ownership of one or more Facilities, makes a sale of all or substantially all of the of the assets of Customer or any Customer, transfers the beneficial ownership of the majority of the outstanding equity of Customer, or otherwise undergoes a change of control by reason of merger, operation of law, or otherwise, Customer shall require the new owner of each Customer to assume this Agreement as part of such transaction, unless MPS does not consent to the assignment. Customer shall inform any potential transferee of this provision. The consent of MPS to any assignment of this Agreement does not constitute consent by MPS to further assignment.

15.6 Governing Law. This Agreement shall be construed and governed by the internal laws of Pennsylvania without application of its conflict of laws rules. The parties submit to the exclusive jurisdiction of and venue in the state and federal courts located

in Butler County, Pennsylvania with respect to any and all disputes concerning the subject of, or arising out of, this Agreement. Each party waives the right to a jury trial.

15.7 _Waiver_. Waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any prior, concurrent or subsequent breach. None of the provisions of this Agreement shall be considered waiver by either party except when such waiver is given in writing.

15.8 _Entire Agreement; Amendment_. This Agreement, including all Exhibits hereto constitute the entire agreement between the parties regarding the subject matter hereof and supersede all prior or contemporaneous discussions, representations, correspondence and agreements, whether oral or written, pertaining thereto. This Agreement may be amended or modified only by a writing duly executed by both parties.

15.9 _Severability_. If any term or provision of this Agreement is held invalid or unenforceable to any extent, the remainder of this Agreement will not be affected thereby and each term and provision of this Agreement will be valid and enforceable to the fullest extent permitted by law, unless doing so materially alters the relative benefits and burdens the parties bargained for herein.

15.10 _Headings_. Any headings of sections herein are for convenience only and do not affect in any way the scope, intent, or meaning of the provisions to which they refer.

15.11 _Counterparts_. This Agreement may be executed in separate counterparts, each of which will be an original and all of which together constitute one and the same agreement binding on each of the parties.

15.12 _Survival_. Sections 3.2, 3.3, 4.2, 8 (to the extent any fees or charges remain due and owing under this Agreement), 9.4, 12, 13, 14 and 15 will survive the expiration or earlier termination of this Agreement.

The parties, through their duly authorized representatives, have executed this Agreement as of the Effective Date.

MILLENNIUM PHARMACY
SYSTEMS, INC.

By: _Stephen R. Duvall_

Print name: _Stephen R. Duvall_

Title: _SVP Sales & Marketing_

CUSTOMER:

By: _George Arezzo_

Print name: _George Arezzo_

Title: _Executive Director_

Addresses for Notice Purposes:
    To Customer:

        Hamilton Park Health Care Center, LTD
        and The Atrium at Hamilton Park
        525 Monmouth Street
        Jersey City, NJ 07302
        Attn.: Legal Department

    To MPS:

        Millennium Pharmacy Systems, Inc.
        1515 West 22nd Street, Suite 910
        Oak Brook, IL 60523
        Attn.: Contract Coordinator

## Schedule 2.7

## Service Guarantees

1. <u>Accuracy of Medication</u>. MPS guarantees that the Customer shall not incur any Class B Prescription Drug Occurrences (i.e., errors that leave the MPS pharmacy and are not caught before administration to the patient). For each such reportable event that occurs, MPS will credit the Customer $1,000.

2. <u>Daily Delivery Timeliness</u>. Assuming Customer meets order entry by 5:00 pm (local time) Monday through Friday; and 2:00 pm (local time) Saturday MPS guarantees on time delivery such that normal daily delivery shall be made before 10:30 pm (local time) or before 8:00 pm (local time) on Saturdays. For each such late delivery that occurs, MPS shall credit the Customer $100. This delivery guarantee does not apply on Sundays or holidays when national banks are closed

3. <u>STAT Delivery Timeliness</u>. MPS guarantees that STAT deliveries to the Customer will be made within four hours of receipt of orders submitted to the MPS pharmacy. If an emergency medication is not made available from an on-site Medi-Dispense (automated dispensing cabinet) unit, emergency box, or is not delivered from a retail back up pharmacy within such four hour time frame, then for each such occurrence, MPS shall credit the Customer $100.

MPS shall not be liable for failure to meet the delivery time frames set forth in Paragraphs 2, 3 or 5 for reasons beyond its reasonable control, including events of Force Majeure as set forth in the Agreement.

## SERVICES

| MPSRX PRODUCT AND SERVICE | Hamilton Park SPECIAL FEE |
|---|---|
| MPSRX SOFTWARE, SOFTWARE ENHANCEMENTS, DATA HOSTING | $4.00/Per Bed/Month |
| REAL TIME FINANCIAL DASHBOARD | $1.50/Per Bed/Month |
| MEDICARE PART D MANAGEMENT | $1.50/Per Bed/Month |
| SOFTWARE SUPPORT | $1.00/Per Bed/Month |
| HARDWARE, WIRING OFFERING (Computers, scanners, mouse, printers) | $2.00/Per Bed/Month |
| HARDWARE SUPPORT | $1.00/Per Bed/Month |
| TELCO LINE CHARGE | $No Charge |
| PHARMACY SERVICES WITH 3/4 DAY FILL CYCLE | **Included in MPSRX Software License Fee** |
| MED DISPENSE ( 350 ITEMS WITH ELECTRONIC COMMUNICATION TO PHARMACY) | **Included in MPSRX Software License Fee** |
| TRAINING PRE GO LIVE: 40 HOURS ONSITE | **Included in MPSRX Software License Fee** |
| ONLINE INTERACTIVE TRAINING PROGRAM (Webcam, Webinar) | **Included in MPSRX Software License Fee** |
| ON-SITE IMPLEMENTATION GO LIVE SUPPORT | **Included in MPSRX Software License Fee** |
| TOTAL MONTHLY FEE PER LICENSED BED | **$11.00/Per Bed/Month** |
| **CONSULTANT PHARMACIST FEES** | |
| PHARMACY CONSULTING SERVICES | $50.00/hr |
| | |
| **ADDITIONAL CLINICAL SUPPORT** | |
| ADDITIONAL GO LIVE TRAINING OR SUPPORT | |
| ON SITE POST GO LIVE SUPPORT | |
| | |

## TOTAL LICENSED BEDS:  SNF 260   AL 113

| | INITIALS | DATE |
|---|---|---|
| PHARMACY: | 5RD | 7/20/2010 |
| CUSTOMER: | CA | 7/14/2010 |

## EQUIPMENT

This <u>Exhibit B</u> is subject to the terms and conditions of the Pharmacy Services Agreement ("**Agreement**") between Millennium Pharmacy Systems, Inc. ("**MPS**") and HAMILTON PARK HEALTH CARE CENTER, LTD and THE ATRIUM AND HAMILTON PARK ("**Customer**") dated July 15, 2010. Terms not defined in this <u>Exhibit B</u> have the meaning given to them in the Agreement.

1.     **Equipment Furnished by MPS**

Equipment needs are determined by MPS based on the layout of the Customer (s).

| DESCRIPTION | MPS EQUIPMENT PROVIDED | Serial No. |
|---|---|---|
| LICENSED SNF SERVICE BEDS | TBD | |
| MED CARTS | TBD | |
| LAP TOPS | TBD | |
| DESK TOPS | TBD | |
| PRINTERS | TBD | |
| ACCESS POINTS | TBD | |
| SCANNERS | TBD | |
| SERVER | TBD | |
| OTHER HARDWARE | TBD | |

2.     **Equipment furnished by Customer:**

[TBD]

3.     **Additional Terms and Conditions Applicable to the Equipment**

    3.1    <u>Retained Ownership</u>. The Equipment is, and will at all times be and remain, MPS' and its lessors' personal property, notwithstanding that the Equipment or any part thereof may now be, or hereafter become, in any manner affixed or attached to real property or any improvements thereon, and Customer shall have no right, title, or interest therein, except as herein set forth, and no right to purchase or otherwise acquire title to or ownership of the Equipment. Customer shall not remove any labels indicating that the Equipment is owned or leased by MPS. Customer hereby authorizes MPS and/or its lessors to cause the Agreement, or any statement or other instrument in respect of the Agreement showing the interest of MPS or its lessors in the Equipment, including Uniform Commercial Code Financing Statements, to be filed or recorded and re-filed and re-recorded. Customer shall execute and deliver any statement or instrument reasonably requested by MPS for such purpose. Customer shall at its expense protect and defend the title of MPS and/or its lessors against all persons claiming against or through Customer; Customer shall not sell, secrete, assign, transfer, lease, sublet, loan or part with possession of the Equipment, and shall at all times keep the Equipment free from any legal process or encumbrance whatsoever including but not limited to liens, attachments, levies and

executions, and shall give MPS prompt written notice thereof and shall indemnify MPS from any loss caused thereby unless otherwise agreed upon in writing by MPS. Customer shall execute and deliver to MPS, upon MPS' request, such further instruments and assurances as MPS reasonably deems necessary or advisable for the confirmation or perfection of MPS' rights hereunder.

      3.2    <u>Return</u>. Upon expiration or earlier termination of the Agreement, Customer shall permit MPS to remove the Equipment from the Customer (s). The Equipment must be in good repair, condition and working order, ordinary wear and tear excepted. Customer shall also pay to MPS such sum as may be necessary to replace any damaged, broken or missing parts of the Equipment.

      3.3    <u>Risk of Loss</u>. Customer shall bear all risks of loss of and damage to the Equipment from any and every cause whatsoever. Occurrence of such loss or damage will not relieve Customer of any obligation hereunder. In the event of loss or damage, Customer, at its expense and option, shall pay to MPS the replacement cost in the Equipment.

      3.4    <u>Location</u>. All Equipment must be located at the Customer (s) set forth below. Any subsequent resale or removal to a new location without prior approval from MPS is a basis for termination in accordance with the Agreement.

    **Customer:**

**HAMILTON PARK HEALTH CARE CENTER, LTD**
**& The Atrium at Hamilton Park**
**525 Monmouth St.**
**Jersey City, NJ 07302**

## 4.    <u>Maintenance and Support</u>

      4.1    <u>Equipment Maintenance</u>. Customer shall use the Equipment only in connection with the Services and Customer and MPS shall work together to instruct Customer's personnel as to how to use the Equipment properly. MPS shall be responsible for ongoing maintenance and repairs to the Equipment. MPS shall have no obligation to provide maintenance services or replacement parts on the Equipment in connection with (a) repair, replacement or maintenance arising from (i) any intentional acts or negligence of Customer's employees, agents or invitees, (ii) attempts to repair or service the Equipment made by persons other than MPS' authorized agents, (iii) use of interfaces or devices not provided by MPS in connection with the Equipment or the Technology unless authorized by MPS in writing, or (iv) use of the Equipment other than in compliance with the Documentation and in compliance with all laws and regulations that may govern the use of the Equipment; (b) repairs or maintenance of accessories, attachments, supplies, machines or other devices not furnished by MPS, or of electrical work exterior to the Equipment; or (c) maintenance required by damage to the Equipment resulting from transportation by Customer (other than ordinary use).

Intending to be legally bound, the parties have executed this <u>Exhibit B</u> as of July 15, 2010.

**MILLENNIUM PHARMACY**
**SYSTEMS, INC.**

By: _Stephen R. Durall_ (signature)

Print name: _Stephen R. Durall_

Title: _SVP Sales & Marketing_

**CUSTOMER:**

By: _George Arezzo_ (signature)

Print name: _George Arezzo_

Title: _Executive Director_

_7/14/2010_

Exhibit C

## BUSINESS ASSOCIATE PRIVACY ADDENDUM

made this 15th day of July 2010

WHEREAS, the federal government has promulgated privacy regulations relating to the use, storage, transmission, and disclosure of patients' private health information; and

WHEREAS, these regulations are known by the acronym "HIPAA" (citations to the HIPAA privacy regulations are made through this Addendum); and

WHEREAS, pursuant to these regulations, Millennium Pharmacy Systems is under an obligation to protect the content of its patients' private health information; and

WHEREAS, the regulations require Millennium Pharmacy Systems to enter into agreements with its vendors, suppliers, and others with which it does business ("Business Associate") requiring the Business Associate to undertake certain commitments restricting the use, disclosure, and handling of private health information acquired or accessed by the Business Associate.

NOW, THEREFORE, intending to be legally bound, the parties hereby agree as follows.

**Section 1**     **DEFINITIONS**

1.1     "Millennium Pharmacy Systems". For purposes of this Addendum, the term "Millennium Pharmacy Systems" shall include all entities as may be from time-to-time covered by the joint notice of privacy practices of Millennium Pharmacy Systems, Inc. Millennium Pharmacy Systems reserves the right to amend this list from time to time without specific amendment of this Addendum.

1.2     "Business Associate". The term "Business Associate" shall mean HAMILTON PARK HEALTH CARE CENTER, LTD and THE ATRIUM AT HAMILTON PARK.

1.3     "Protected Health Information". The term "Protected Health Information" shall mean information that (1) relates to the past, present, or future physical or mental health or condition of an individual and (2) either identities an individual or could be used to identify an individual.

1.4 "Designated Record Set". The term "Designated Record Set" shall mean any item or grouping of information that includes Protected Health Information and is maintained, collected, used or disseminated by Millennium Pharmacy Systems.

1.5 "Privacy Officer". The term "Privacy Officer" shall mean the contact person within Millennium Pharmacy Systems who receives information and is responsible for the policies and procedures pertaining to the Business Associate Agreement and HIPAA Privacy Regulations.

## Section 2. PERMITTED USES AND DISCLOSURES OF PROTECTED HEALTH INFORMATION

2.1 Services. Pursuant to the Underlying Agreement, Business Associate provides services ("Services") on behalf of Millennium Pharmacy Systems that involve access to use or disclosure of Protected Health Information. Except as otherwise specified herein, Business Associate may only make uses of Protected Health Information necessary to perform its obligations under this Agreement. All uses not authorized by this Addendum are prohibited. Moreover, Business Associate may disclose Protected Health Information necessary to perform its obligations under this Agreement only, (i) to its employees, subcontractors and agents, in accordance with Section 3.1 (e); (ii) as directed by Millennium Pharmacy Systems; or (iii) as otherwise permitted by the terms of this Addendum including, but not limited to, section 2.2(b) below.

2.2 Business Activities of the Business Associate. Unless otherwise limited by this Addendum, the Business Associate may:

   a. *use* the Protected Health Information in its possession for the proper management and administration and to carry out the legal responsibilities of the Business Association if such uses are permitted under state and federal confidentiality laws.
   b. *disclose* Protected Health Information to third parties for the purpose of its proper management and administration or to carry out the legal responsibilities of the Business Associate, provided that the Business Associate represents to Millennium Pharmacy Systems, in writing, that (i) the disclosures are required by law, as provided for in 45 C.F.R. § 164.501 or (ii) the Business Associate obtains written assurance from the third-party recipient of the information that the third party will hold the information confidentially, in accordance with the Privacy Regulations, and use or further disclose the information only as required by law or for the purpose for which it was disclosed to the third party, and the third party notifies the Business Associate of any confidentiality breaches.

2.3 Additional Activities of Business Associate. In addition to *using* the Protected Health Information to perform the Services set forth in Section 2.1 of this Addendum, Business Associate may:

   a. aggregate the Protected Health Information in its possession with the Protected Health Information of other covered entities that the Business Associate has in its

possession through its capacity as a Business Associate to said other covered entities provided that the purpose of such aggregation is to provide Millennium Pharmacy Systems with data analyses relating to the health care operations of Millennium Pharmacy Systems. Under no circumstances may the Business Associate disclose Protected Health Information of Millennium Pharmacy Systems to another covered entity absent the explicit authorization of Millennium Pharmacy Systems.

b.  de-identify any and all Protected Health Information provided that the de-identification conforms to the requirements of 45 C.F.R. § 164.514(b), and further provided that Millennium Pharmacy Systems maintains the documentation required by 45 C.F.R. § 164.514(b) which may be in the form of a written assurance from the Business Associate. De-identified information does not constitute Protected Health Information and is not subject to the terms of this Addendum.

## Section 3    RESPONSIBILITIES OF THE PARTIES WITH RESPECT TO PROTECTED HEALTH INFORMATION

3.1 Responsibilities of the Business Associate. With regard to its use and/or disclosure to Protected Health Information, the Business Associate hereby agrees to:

a.  use and/or disclose the Protected Heath Information only as permitted or required by this Addendum or as otherwise required by law.

b.  report to the designated Privacy Officer of Millennium Pharmacy Systems, in writing, any use and/or disclosure of the Protected Health Information that is not permitted or required by this Addendum of which Business Associate becomes aware. This reporting must occur within fourteen (14) days of the Business Associate's discovery of such unauthorized use and/or disclosure.

c.  establish procedures for mitigating, to the greatest extent possible, any deleterious effects from any improper use and/or disclosure of Protected Heath Information.

d.  use all reasonable efforts and safeguards to maintain the security of the Protect Health Information and to prevent unauthorized use and/or disclosure of such Protected Heath Information.

e.  require all of its subcontractors and other agents that receive or use, or have access to, Protected Health Information under this Addendum to agree, in writing, to adhere to the same restrictions and conditions on the use and/or disclosure of Protected Health Information that apply to the Business Associate pursuant to this Addendum.

f.  make available all records, books, agreements, policies and procedures relating to the use and/or disclosure of Protected Health Information to the Security of HHS for purposes of determining Millennium Pharmacy Systems' compliance with the Privacy Regulations, subject to attorney-client and other applicable legal privileges.

3

g. upon prior written request, make available during normal business hours at Business Associate's offices all records, books, agreements, policies and procedures relating to the use and/or disclosure of Protected Health Information to Millennium Pharmacy Systems for the purpose of enabling Millennium Pharmacy Systems to determine the Business Associate's compliance with the terms of this Addendum.

h. within forty-five (45) days of receiving a written request from Millennium Pharmacy Systems, provide to Millennium Pharmacy Systems such information as is requested by Millennium Pharmacy Systems to permit Millennium Pharmacy Systems to respond to a request by an individual for an accounting of the disclosure of the individual's Protected Health Information in accordance with 45 C.F.R. § 164.528

i. subject to Section 6.5 below, return to Millennium Pharmacy Systems or destroy, within sixty (60) days of the termination of this Addendum, the Protected Health Information in its possession and retain no copies, backup tapes, or any other reproduction, electronic or otherwise, of Protected Health Information.

j. disclose to its subcontractors, agents or other third parties, and request from Millennium Pharmacy Systems, only the minimum Protected Health Information necessary to perform of fulfill a specific function required or permitted hereunder.

3.2 Responsibilities of Millennium Pharmacy Systems. With regard to the use and/or disclosure of Protected Health Information by the Business Associate, Millennium Pharmacy Systems hereby agrees:

a. to inform the Business Associate of any changes in, or withdrawal of, the consent or authorization provided to Millennium Pharmacy Systems by individuals.

b. If the Business Associate is providing services related to marketing or fundraising, to inform the Business Associate of any opt-outs exercised by any individual from marketing and/or fundraising activities of Millennium Pharmacy Systems.

c. To notify the Business Associate, in writing and in a timely manner, of any arrangements permitted or required of Millennium Pharmacy Systems pursuant to the Privacy Regulations that may impact in any manner the use and/or disclosure of Protected Health Information by the Business Associate under this Addendum, including, but not limited to, restrictions on use and/or disclosure of Protected Health Information as provided for in 45 C.F.R. § 164.522 agreed to by Millennium Pharmacy Systems.

d. that Business Associate may make any use and/or disclosure of Protected Health Information as permitted under, and pursuant to, 45 C.F.R. § 164.512 except that uses or disclosures for research are not permitted without prior approval by Millennium Pharmacy Systems.

## 4. ADDITIONAL RESPONSIBILITIES OF THE PARTIES WITH RESPECT TO PROTECTED HEALTH INFORMATION

4.1 <u>Responsibilities of the Business Associate with Respect to Handling of Designated Record Set.</u> If the Protected Health Information constitutes a Designated Record Set, the Business Associate hereby agrees to do the following:

   a.  at the request of, and in the time and manner designated by Millennium Pharmacy Systems, provide Millennium Pharmacy Systems, or the individual to whom such Protected Health Information relates or his or her authorized representative, access to the Protected Health Information in order to meet a request by such individual under 45 C.F.R. § 164.524.
   b.  at the request of, and in the time and manner designated by Millennium Pharmacy Systems, make any amendment(s) or supplements to the Protected Health Information that Millennium Pharmacy Systems directs the Business Associate to make.

4.2 <u>Responsibilities of the Millennium Pharmacy Systems with Respect to the Handling of the Designated Record Set.</u> If the Protected Health Information constitutes a Designated Record Set, Millennium Pharmacy Systems hereby agrees to do the following:

   a.  notify the Business Association, in writing, of any Protected Health Information that Millennium Pharmacy Systems directs the Business Associate to make available to an individual pursuant to 45 C.F.R. § 164.524 and the time, manner and form in which the Business Associate shall provide such access.

   b.  notify the Business Associate, in writing, of any amendment(s) or supplements to the Protected Health Information and inform the Business Associate of the time, form and manner in which such amendment(s) shall be made.


## 5.  **REPRESENTATIONS AND WARRANTIES OF THE BUSINESS ASSOCIATE**

5.1 <u>Representations and Warranties of the Business Associate.</u>
   The Business Associate represents and warrants to Millennium Pharmacy Systems:

   a.  that all of its employees, agents, representatives and members of its workforce, whose services may be used to fulfill obligations under this Addendum are or shall be appropriately informed of the terms of this Addendum and are under legal obligation to the Business Associate, by contract or otherwise, sufficient to enable the Business Associate to fully comply with all provisions of this Addendum with respect to the Privacy Regulations, including, without limitation, the requirement that modifications of limitations that Millennium Pharmacy Systems has agreed to adhere to with regards to the use and disclosure of Protected Health Information of any individual that materially affects and/or limits the uses and disclosures that are otherwise permitted will be implemented by the Business Associate in a timely fashion.

   b.  that it will reasonably cooperate with Millennium Pharmacy Systems in the performance of the mutual obligations under this Addendum with respect to the Privacy Regulations.

c.  that neither the Business Associate, nor its shareholders, members, directors, officers, agents, employees or members of its workforce have been excluded or served a notice of exclusion or have been served with a notice of proposed exclusion, or have committed any acts which are cause for exclusion, from participation in, or had any sanctions, or civil or criminal penalties imposed under, any federal or state healthcare program, including but not limited to Medicare or Medicaid, or have been convicted, under federal or state law ( including without limitation a plea of nolo contendere or participation in a first offender deterred adjudication or other arrangement whereby a judgment of conviction has been withheld), of a criminal offense related to (a) the neglect or abuse of a patient, (b) the delivery of an item or service, including the performance of management or administrative services related to the delivery of an item or service, under a federal or state healthcare program, (c) fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in any program operated by or financed in whole or in part by any federal, state or local government agency, (d) the unlawful, manufacture, distribution, prescription or dispensing of a control substance, or (e) interference with or obstruction of any investigation into any criminal offense described in (a) though (b) above. Business Associate further agrees to notify Millennium Pharmacy Systems immediately after the Business Associate becomes aware that any of the forgoing representation and warranties may be inaccurate or may become incorrect.

## 6   TERMS AND TERMINATION

6.1 Term. This Addendum shall become effective on the Effective Date, as noted on the signature pages of this Addendum, and shall continue in effect until all obligations of the Parties have been met, unless terminated as provided herein. In addition, certain provisions and requirements of this Addendum shall survive its expiration or other termination in accordance with Section 8.3 herein.

6.2 Termination by the Millennium Pharmacy Systems. As provided for under 45 C.F.R. § 164.504 (e)(2)(iii), Millennium Pharmacy Systems may immediately terminate this Addendum, the Underlying Agreement, and any related agreements if Millennium Pharmacy Systems determines that the Business Associate has breached a material term of this Addendum. Alternatively, Millennium Pharmacy Systems may choose to: (i) provide the Business Associate with ten (10) days written notice of the existence of an alleged material breach; and (ii) afford the Business Association an opportunity to cure said alleged material breach upon mutually agreeable terms. Nonetheless, in the event that mutually agreeable terms cannot be achieved within fourteen (14) days of the previous notice, Business Associate must cure said breach to the satisfaction of Millennium Pharmacy Systems within thirty (30) days of the original notice of deficiency. Failure to cure in the manner set forth in this paragraph is grounds for the immediate termination of this Addendum and/or the Underlying Agreement.

6.3 Termination by Business Associate. If the Business Associate determines that a material condition of performance has changed under this Agreement or that Millennium Pharmacy

Systems has breached a material term of this Addendum, Business Associate may provide thirty (30) days notice of its intention to terminate this Addendum. Business Associate agrees, however, to cooperate with Millennium Pharmacy Systems to find a mutually satisfactory resolution to the matter prior to terminating and further agrees that, notwithstanding this provision, it shall not terminate this Addendum so long as the Underlying Agreement is in effect.

6.4 <u>Automatic Termination</u>. This Addendum will automatically terminate without any further action of the Parties upon the termination or expiration of the Underlying Agreement between the Parties.

6.5 <u>Obligations of the Business Association Upon Termination or Non-Renewal</u>.

a. *Return or Destruction.* Upon the termination or non-renewal of the Underlying Agreement, Business Associate agrees to return or destroy all Protected Health Information in its possession pursuant to 45 C.F.R. § 164.504 (e)(2)(l), if it is feasible to do so.

b. *Non-Return or Destruction.* If it is not feasible for the Business Associate to return or destroy the Protected Health Information, the Business Associate will notify Millennium Pharmacy Systems in writing. This notification will include:

   i. a statement that the Business Associate has determined that it is not feasible to return or destroy the Protected Health Information in its possession, and

   ii. the specific reasons for its determination

c. *Manner of Retaining Information.* If the information is not returned or destroyed upon termination of expiration, the Business Associate agrees to extend any and all protections, limitations and restrictions contained in this Addendum to its use and/or disclose of any Protected Health Information and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the Protected Health Information infeasible.

d. *Information Possessed by Subcontractor.* If it is nor feasible for the Business Associate to obtain from a subcontractor or an agent Protected Health Information that is in the possession of the subcontractor or agent, the Business Associate must provide a written explanation to Millennium Pharmacy Systems and require the subcontractors and agents to agree to extend any and all protections, limitations and restrictions contained in this Addendum to the subcontractors' and/or agents' use and/or disclosure of any Protected Health Information retained after the termination or expiration of this Addendum, and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the Protected heath Information infeasible.

## 7. MISCELLANEOUS

7.1 <u>Survival</u>. The respective rights and obligations of the Business Association and Millennium Pharmacy Systems with respect to Protected Health Information that the Business Associate retains in accordance with Section 6.5 because it is not feasible to return or destroy such Protected Health Information, shall survive termination of this Addendum indefinitely. In addition, Section 3 shall survive termination of this Addendum, if Millennium Pharmacy Systems determines that the Protected Health Information being retained pursuant to Section 6.5 herein constitutes a Designed Record Set.

7.2 <u>Amendments; Waiver</u>. This Addendum may not be modified, nor shall any provision hereof be waived or amended, except in a writing duly signed by authorized representatives of the parties. A waiver with respect to one event shall not be construed as continuing, or as a bar to or waiver of any right or remedy as to subsequent events.

7.3 <u>No Third Party Beneficiaries</u>. Nothing express or implied in this Addendum is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations, or liabilities whatsoever.

7.4 <u>Notices</u>. Any notices to be given hereunder to a party shall be made via U.S. Mail or express courier to such party's address given below, and/or (other than for the delivery of fees) via facsimile to the facsimile telephone numbers listed below

If to Business Associate:

HAMILTON PARK HEALTH CARE CENTER, LTD
& THE ATRIUM AN HAMILTON PARK
525 Monmouth St.
Jersey City, NJ 07302

with a copy (which shall not constitute notice) to:

Millennium Pharmacy Systems, Inc.
1515 West 22nd Street, Suite 910
Oak Brook, IL 60523
Contract Coordinator
Fax: 630-382-1313

Each party named above may change its address and that of its representative for notice by giving notice thereof in the manner herein above provided.

7.5 <u>Counterparts; Facsimiles</u>. This Addendum may be executed in any number of counterparts, each of which shall be deemed an original. Facsimile copies hereof shall be deemed to be originals. If there is a discrepancy between conflicting provisions of different counterparts, the most recent counterpart controls.

7.6 Disputes. If any controversy, disputes or claim arises between the Parties with respect to this Addendum, the Parties shall make good faith efforts to resolve such matters informally.

7.7 LIMITATION OF LIABILITY. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES OF ANY KIND OR NATURE, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONFLICT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), OR OTHERWISE, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES.

7.8 The parties agree to enter into a mutually acceptable amendment to this Addendum as necessary to comply with applicable federal laws and regulations governing the use and/or disclosure of individually identifiable health information. Such amendment shall be entered into on or before the date on which Millennium Pharmacy Systems is required to be in compliance with the Privacy Regulations promulgated under Health Insurance Portability and Accountability Act of 1996.


IN WITNESS WHEREOF, each of the undersigned has caused this Addendum to be duly executed in its name and on its behalf.

**MILLENNIUM PHARMACY SYSTEMS, INC.**

By: _Stephen R Duvall_

Print Name: _Stephen R. Duvall_

Print Title: _SVP Sales & Marketing_

Date: _7/20/2010_

**BUSINESS ASSOCIATE**

By: _George Arezzo_

Print Name: _George Arezzo_

Print Title: _Executive Director_

Date: _7/14/2010_

**Exhibit D**

**Pharmaceutical Product Pricing**

1. <u>Monthly Fees</u>

   1.1 <u>Per Patient Day (PPD)t</u>: The initial Customer Per Patient Day (PPD) rate shall be $14.18 for the initial one hundred eighty (180) days from the effective date of this agreement. This rate will apply to both Medicare A and Managed Car residents. Residents at The Atrium at Hamilton Park, using (MPS) will be charged usual and customary charges, or rates established by the Medicare Part D programs.

      1.2 <u>Per Patient Day (PPD) Reset</u>: Millennium Pharmacy Systems (MPS) will recalculate the Customer Per Patient Day (PPD) one hundred eighty (180) days from the effective date of the agreement. The reset rate will be calculated by applying the Fee For Service (FFS) pricing schedule defined in Exhibit (E) of this Agreement to actual utilization for the actual reset period. The new calculated rate will not increase more than $1.50 for the first reset period. Millennium Pharmacy Systems (MPS) will then recalculate the Customer Per Patient Day (PPD) every three hundred sixty five (365) days for the duration of the Agreement. If a new reset rate is actually lower than the current rate, then the Per Patient Day (PPD) will be reduced accordingly for the next reset period. PPD increases shall not exceed 10% each year during the contract period provided that the payer mix and resident acuity levels are consistent with the payer mix and acuity in place at the Customer at the initial effective date of this agreement.

      1.3 <u>Required Information and Definitions</u>: Customer shall provide Millennium Pharmacy System (MPS) with its Medicare A and Managed Care census days and such other information as is set forth in section 2.5 of the Pharmacy Services Agreement.

      1.4 <u>Therapeutic Interchange Program</u>: Consistent with section 6.2 of the Pharmacy Services Agreement, Customer shall make every attempt to follow Millennium's policies and procedures for the Therapeutic Interchange Program (TIP) agreed upon by MPS and the corporate Medical Director.

2. Medical Products Excluded from the PPD ("Exclusions"). The parties agree that the below list of Medical products is excluded from the PPD. These Medical Products shall be billed to the Customer separately utilizing the Fee Schedule defined in Exhibit E. " FFS Fee Pricing"
   a. Medications on the Exclusion List
   b. Infusion Medications and therapy services
   c. All injectable medications except insulin
   d. House Stock over the counter medications
   e. Medical Supplies

SᴀD          7/20/2010

**INITIALS** _____ **DATE** 7/14/2010

## Exhibit E

**Cost to Customer**

This fee schedule shall apply to all Medical Products that are not included in the PPD calculations referenced in Exhibit D and are billable to the Customer.

1. Prescriptions:

   Brand legend medications will be billed to the Customer or other non-third party payer at the wholesale acquisition cost (WAC) plus 8% plus a $3.73 dispensing fee or if a particular NDC has no published WAC then average wholesale price (AWP) minus 25% plus a $3.73 dispensing fee shall apply.

   Generic legend medications will be billed to the Customer or other non-third party payer at the lower of maximum allowable cost (MAC) plus a $3.73 dispensing fee, federal upper limit (FUL) plus a $3.73 dispensing fee or WAC plus 8% plus a $3.73 dispensing fee or if a particular NDC has no published WAC then AWP minus 35% plus a $3.73 dispensing fee shall apply.

   Over the Counter ( OTC ) resident specific will be billed at NJ capitated rate of $0.64 per patient day.

   Non-resident specific bulk house stock product will be billed to the Customer or appropriate payer at the AWP minus 25% with a minimum $2.49 charge.

   The term "WAC" shall mean the Wholesale Acquisition Cost of such pharmaceutical product, as published in MediSpan or such other publication selected by MPS that publishes the same pricing information. The term "AWP" shall mean the Average Wholesale Price of such pharmaceutical product published by the same data source. If the pharmaceutical industry adopts a different standard than "WAC" or "AWP" for pricing pharmaceutical products then MPS upon Customer consent shall be entitled to alter the Fee Schedule detailed in Exhibit E to adopt such different standard and maintain an economically equivalent price to the Customer.

2. Routine oral solid medications shall be dispensed in a 3-4 day cycle format with one dispensing fee per 30 days being billed to the Customer.

3.  IV Therapy Services:

IV Antibiotics will be billed at a rate of $70 per day. IV medications on the exclusion list will be billed at WAC + 8% plus $20.00 fee.

IV Hydration- will be billed at$23 per day.

Pain Management will be billed at WAC + 8% + $20 fee.

TPN (Standard formulation with lipids) - will be billed $150 per day.

TPN (Non-standard additives)- will be billed at WAC plus 8% (branded drugs) or AWP minus 40% (generic drugs), plus $45 per day.

IV Supplies- will be billed at the AWP minus 25%.

IV Pumps- will be billed at $10.00 per day when used.

IV Line Placement-
  Peripheral IV Insertion- will be billed at $135 + supplies.
    Midline Insertion- will be billed at $210 + supplies.
    PICC Insertion- will be billed at $300 + supplies.
    Nursing Visit- will be billed at $135 + supplies.
    Access Port- will be billed at $90.
    PICC Repair- will be billed at $100.
  *Pricing includes supplies for one insertion. All other supplies are to be billed according to Schedule A.

IV Education-
    State Board Approved 16 Hour Basic IV Certification Course will be billed at $600 per day (maximum 12 nurses).
    Certification preparation will be billed at $10 each.
    Basic IV Review 1-Day Course will be billed at $600 per day (maximum 12 Nurses).

IV In-services- will be billed at $250.

|  | INITIALS | DATE |
|---|---|---|
| **PHARMACY:** | SRJ | 7/20/2010 |
| **CUSTOMER:** | CA | 7/14/2010 |

| MILLENNIUM PHARMACY PER DIEM EXCLUSION LIST | | | | |
|---|---|---|---|---|
| **BIOLOGICALS** | **HIV/AIDS** | **MISCELLANEOUS** | **CHEMOTHERAPEUTICS** | **CHEMOTHERAPEUTICS** |
| ***IVIG (all brands) | Aptivus | Abelcet (ampho b lipid) | Aldara | Torisel |
| **Interferon (all brands) | Atripla | Actiq (fentanyl citrate lozenge) | Alkeran | Treanda |
| *Growth Hormone (all brands) | Combivir | Activase (except Cathflo) | Aloxi | Treistar |
| Actimmune | Crixivan | Agrylin (anagrelide) | Aredia | Tykerb |
| Albumin | Cytovene (ganciclovir) | Alinia | Aromasin | Velcade |
| Aranesp | Emtriva | Ambisome (ampho b lipid) | Avastin | VePesid (etoposide) |
| Arava (leflunomide) | Epivir | Amrix | Camptosar (irinotecan) | Vladur (leuprolide) |
| Avonex | Epzicom | Ancoban | Casodex | Vidaza |
| Baraclude | Famvir (famciclovir) | Anzemet | Cyclophosphamide | Vumon |
| Betaseron | Foscavir (foscarnet) | Argatroban | Cytosar-U | Xeloda |
| Cellcept | Fuzeon | Arixtra | Dacogen | Zanosar |
| Copaxone | Hepsera | Avitene, Hemotene | Doxil | Zevalin |
| Copegus (ribavirin) | Hivid | Botox | Efudex | Zinecard |
| Enbrel | Intelence | Cancidas | Eligard (leuprolide) | Zoladex |
| Epogen | Invirase | Cubicin | Ellence | Zolinza |
| Euflexxa | Isentress | Doribax | Eloxatin | |
| Humira | Kaletra | Duragesic | Emcyt | |
| Hyalgan | Lexiva | Edecrin INJ ONLY | Emend | |
| Kineret | Mycobutin | Eraxis | Erbitux | |
| Letairis | Norvir | Exjade | Ethyol | |
| Leukine | Pentamidine (IV only) | Forteo | Etoposide Phosphate | |
| Neulasta | Prezista | Ganite | Faslodex | |
| Neumega | Rescriptor | Hectorol (IV only) | Femara | |
| Neupogen | Retrovir (zidovudine) | Innohep | Fludara | |
| Orencia | Reyataz | Inotropes | Fluoroplex (fluorouracil) | |
| PEG-Intron | Selzentry | Integrilin | Gemzar | |
| Procrit | Sustiva | Invega | Gleevec | **WOUND CARE** |
| Prograf | Trizivir | Kytril (granisetron) | Herceptin | Accuzyme |
| Rapamune | Truvada | Lioresal (injectable only) | Hycamtin | Etheryme |
| Rebetol (ribavirin) | Tyzeka | Marinol | Iressa | Gladase |
| Rebetron (ribavirin) | Valcyte | Mepron | Lupron (leuprolide) | Kovia |
| Rebif | Valtrex | Mycamine | Lysodren | Panafil |
| Remicade | Videx, Videx EC (didenosine) | Myobloc | Matulane | Pap-urea |
| ReoPro | Viracept | Natrecor | Mylocel (hydroxeurea) | Allenderm |
| Revatio | Viramune | Nimotop (nimodipine) | Nexavar | Dermuspray |
| Rituxan | Viread | Noxafil | Nolvadex | Granulderm |
| Roferon A | Vistide | Oxandrin (oxandrolone) | Novantrone | Granulex |
| Sandestatin (octreotide) | Zerit | Primacor (milrinone) | Orplatna (satraplatin) | Optase |
| Serostim | Ziagen | Promogram | Paraplatin | TBC |
| Somatuline Depot | | Pulmozyme | Platinol-AQ | Xenaderm |
| Synvisc, Synvisc One | | Refludan | Proleukin | |
| Testim Gel | | Regranex | Revimid | |
| Tracleer | | Relistor | Rituxan | |
| Ventavis | | Rilutek | Sprycel | |
| Virazole (ribavirin) | | Sensipar | Sutent | |
| Xigris | | Sporanox (injectable only) | Synovir | |
| Zenapax | | Synercid | Tarceva | |
| | | Tygacil | Targretin | |
| | | Vfend | Taxol | |
| | | Viagra | Taxotere | |
| | | Zemplar | Temodar | |
| | | Zometa | Thalmoid | |
| | | Zyvox (linezolid) | Toposar (etoposide) | |

**Please be aware:** The FDA is approving new medications in the above categories on an ongoing basis. If you have any questions, please call or send an electronic message to our 24 hour call center. Additionally, all categories are not limited to drugs listed.

Growth Hormone brands include but are not limited to Serostim, Sometrem, Gentropin, Nutropin, Protropin, Serotropin, Humarope, Siezen, Zorbitive, Omnitrope, Hypertropin, Jintropin, Zomacton & others

*Hypertropin, Jintropin, Zomacton & others

**IVIG brands include but are not limited to Pangklobulin, Octagam, Gamimune, Sandoglobulin, Privigen & others

***Interferon brands include but are not limited to Roferon, Intron, Rebetron, Rebif, Peg-intron, Infergen, Pegasys, & others